” The opinion of the Court was read, as drawn up by
Wilde J.
This is an action of assumpsit to recover a rent-charge reserved in and by certain indentures made in the year 1742, between the predecessors of the plaintiffs in the trust and one Jason Walker ; by which indentures certain lands were leased to Walker, to hold the same to him, his heirs and assigns forever, reserving a certain rent-charge, part of which it is admitted by the defendant, who is the assignee of Walker, now remains due and payable, unless the rent has been discharged or suspended by virtue of certain resolves on which he relies for his defence. The case therefore entirely depends upon the construction and legal effect of these resolves, and especially upon that of 1787. By this resolve the defendant contends that he, and the other tenants in Hopkinton, holding under the trustees, were forever discharged from all rents reserved and charged upon the lands, and that the obligation to pay the same was, with the consent of the plaintiffs, transferred to the Commonwealth. The question as to the supposed obligation of the Commonwealth by virtue of that resolve, and the other resolves on the subject, has been heretofore pro *131 posed to us by an order of the House of Representatives, and was thereupon very carefully examined and fully considered.* On that occasion we had before us the written opinions of the *132 attorney and solicitor general; and those who were interested adversely to the government were heard by their counsel. We do not however consider that opinion binding upon us in *133 this action ; but after carefully revising it, we are satisfied of its correctness, and with the reasons given in support of it. Talcing all the resolves together, or considering that of 1787 *134 by itself, we think it apparent, that the government never intended to assume the obligation of paying the rents, except out ' of the taxes on the land. That was an ample fund for the *135 purpose at the time of the resolve, and remained so for nearly 40 years after, and until the rents became augmented according to the contract of the original parties. The resolve cannot be so construed as to imply a covenant on the part of the Commonwealth to raise and continue a perpetual fund by taxation for the payment of the rents. There could be no motive for such an arrangement, nor is there any thing in the language of the resolve from which it can be inferred that any such arrangement was contemplated. The true construction is, that the rents should be paid out of the taxes so long as the lands should continue to be taxed according to the terms of the resolve, and no longer. When therefore the government ceased to tax the lands, as it has done for several years past, it was thereby exonerated from the obligation of paying the rents. *136 So that at present, the Commonwealth is clearly free from any su°h obligation. And should the exigencies of government, at some future time, require that the system of direct taxation should be revived, we apprehend that it is within the power of the legislature to determine whether these lands shall be taxed according to the resolve of 1787, or, like all other lands, according to the value of the estates, deducting the rent-charge as an incumbrance, if it ought to be so deducted.
The question then is, whether by the resolve of 1787 the defendant and the other tenants of the trust lands were discharged from the obligation of paying the rents charged on their lands. That the legislature had not the power thus to discharge them without the consent of the trustees, is very clear. It would be not only to impair, but wholly to destroy, the obligation of a contract. If therefore these tenants have been so discharged, it must have been done by the trustees themselves through the medium of a resolve of the legislature, and not by virtue of any authority vested in the legislature by the constitution. No evidence was offered at the trial, that any of the resolves referred to in the report of tne case were procured on the application of the trustees. It is true that the resolve of 1787 appears to have been passed on the petition of one Gilbert Dench, who signed “ in behalf of the trustees and tenants of the College lands, &c.” But there was no evidence offered to show that the petitioner was the authorized agent of the trustees, nor has it been suggested that any such evidence exists.
But it is said that the trustees have ratified the doings of the petitioner, by a long acquiescence in the arrangement thereupon made by the legislature, and by receiving the rents from the treasurer of the Commonwealth in pursuance of that arrangement. And to a certain extent this must certainly be admitted. We must understand that the trustees, by their acts, implicitly agreed that the rents should be paid by the tenants into the treasury of the Commonwealth, and to receive the same when so paid, from the hands of the treasurer. But there is no agreement, express or implied, to discharge the rents without payment; nor could the trustees have made such an agreement without violating their trust. Then as the government *137 has discontinued the arrangement of 1787, and is under no legal obligation to revive it, we think it very clear that the defendant is bound to pay the rents in arrear, according to the original contract; as nothing in this temporary arrangement can operate so as to discharge him from his liability.
The judgment therefore of the Court of Common Pleas must be reversed, and a new trial granted at the Bar of tl Court.

 The following is the opinion alluded to, which was drawn up by the Chief Justice.
The Justices of the Supreme Judicial Court having maturely considered the question proposed to them by an order of the House, of '23d February, 1825, are of opinion that the Commonwealth is not under legal obligation to pay to the trustees of the Hopkins donation the rent of the lands formerly held by said trustees, conformably to the amount expressed in the act, passed m the year of our Lord 1741, that is, one penny for each acre until the year 1823, and three pence for each acre forever afterwards.
As this subject has frequently been before the legislature, and as several committees of both branches, composed partly of professional gentlemen of great respectability, have expressed an opinion different from that above declared, we deem it proper to state briefly the reasons which have brought us to our conclusion, in order that the House may form their own opinion as to the course, which, under all circumstances, it may be wisest to follow.
Before the year 1741, the lands in question were held by the tenants under leases from the trustees of the Hopkins fund, for the term of 99 years, at the annual rent of three pence an acre during that term, and not exceeding nine pence an acre after its expiration. The leases commenced the 25th March, 1723. There was no express stipulation for the renewal of the leases at the end of the term; but the trustees were to discharge the tenants from paying any province tax for three quarters of the premises.
In the preamble to the act of 1741, this latter provision is stated to have produced the utter loss of the rents reserved for the pious uses for which the charity was founded.
It is also stated as a grievance to the tenants, that the leases contained no security to them for the right of renewal from term to term forever at the then future rent stipulated.
Application was made for relief to the provincial legislature, probably by both parties ; and in the year 1741, an act passed the legislature, and was approved by the governor, authorizing the trustees, by indentures between them and the tenants, to confirm the several tenements in the tenure of the original termors or their assigns, to hold to them, their heirs or assigns forever; reserving a rent-charge of one penny sterling by the acre till the 25th of March, 1823, and three pence an acre payable on the 25th of March annually, from that time forward forever; the tenants covenanting for themselves, their iieirs and assigns, to pay all province taxes for these lands; to be rated by the General Court from time to time for what they are worth above the rents reserved as aforesaid.
It was also provided in said act, for the benefit of the tenants, that all the lands owned by the trustees above twelve thousand five hundred acres, which had by agreement been before held by the tenants, in common, in proportion to the lands severally held by them in lease as aforesaid, might be granted by the trustees to said tenants, to be by them held in common, or divided, a *132 they should see fit, and this was to be done, as expressed in the act “ the better to enable the tenants to pay the land tax aforesaid.”
The provisions of this act are understood to have been carried into execu tion in the manner therein provided ; and the effect of it, and of the indentures executed in conformity with it, was, to vest a fee simple title in the tenants in all the lands described in their several leases and indentures, sub ject to the charge of rent as stated therein. And from that time the tenants of the land were liable to all province taxes in proportion to the value of their land, deducting from the gross value the amount of the rent charge with which it was encumbered. The legislature, before the passing of this act, had a right, and perhaps were bound, to tax their lands at their full value, unless they should determine to exempt them for the purpose of aiding the charitable fund to which the rents were to be applied; and it is difficult now to per ceive why the value of the rents should be deducted in favor of the tenants, any more than the purchase money of all other lands held in fee simple. Probably the stipulation of the trustees in their leases, to indemnify the tenants from the taxes on three-fourths of the lands, was the inducement which led to this favorable arrangement. But after the passing of this act, the ten. ants alone were liable to be taxed, and they seem to have had an equivalent in the reduced amount of their rents, and in the better title secured to them both in the lands which they held by lease, and the lands in which before the passing of this act they had no title but as commoners.
We can perceive in this statute nothing more than an arrangement between the trustees and the tenants for the mutual benefit of both, which could not, it was thought, be attained without the aid of the legislature. The rights between the parties were fixed and declared; the right of the legislature remained as before, except that by implication it may be inferred, that in all estimates of the' land for taxation the value of the rents secured by the new arrangement should be deducted. Certainly there is no stipulation, express or implied, that the taxes should at no time exceed the rent, or their liability to pay taxes should exonerate the tenants from rent.
The bargain was only between tire trustees and tenants, and this was authorized and sanctioned by the legislature, which acted as a court of chancery, giving validity to a reasonable and beneficial arrangement between par ties, one of which may have been supposed to have been incompetent, without such authority, to have altered the original contract.
It does not appear from any of the papers committed to us, that there was any legislative interposition in relation to these lands, from the year 1741 until the year 1782. Probably the rents were paid, and the taxes assessed, in conformity with the provisions of that act. But in the last-mentioned year, upon the application of the tenants, a resolve passed, directing that these lands should be taxed in the same manner as if they were held in fee simple, and that out of the proceeds the constables or collectors should pay to the treasu. rer of the Hopkins fund, the quitrents which should be due; and it was fur. ther provided in the resolve, that if the constable or collector should neglec! *133 this duty, the treasurer of the State should issue his warrant against the delinquent, and pay over the rent to the treasurer of the trustees
We see nothing in this resolve which tends to create or impose any new obligation upon the Commonwealth or the legislature, the whole effect of it being to facilitate and simplify the assessment and collection of taxes for the mutual accommodation of the government, the trustees and the tenants of the land. We are ignorant in regard to the motives which led to the application for, or the adoption of this resolve, but without doubt some inconvenience re suited to all parties from the mode of estimating the value of the lands, as well as from the manner of collecting the rents. The State consented to become the receiver of the rents for the trustees, if they were not paid over in the manner specified in the resolve, and the relation between the trustees and the tenants by virtue of their contract remained the same.
This resolve was limited in its operation to seven years, but was superseded before the expiration of that time by the resolve of November, 1787, from the terms of which it has been inferred, both by the trustees and the tenants, that a permanent arrangement was thereby created, the effect of which is to impose on the government the obligation to pay the quitrents, after, as well as before the year 1823, without regard to the amount of taxes which may be apportioned on said land ; so that if the rents should ever so much exceed the taxes, or if, as may happen at some future day, no State tax upon land should be required, the State is nevertheless obliged to discharge the rents. This is obviously a very inequitable effect of this resolve; and if such be its effect, it was at best a very indiscreet measure of the legislature ; and considering its consequences, it may be questioned on the score of authority in the legislature ; for the direct effect would be, in the present state of things, to create a partial exemption from taxes in favor of a portion of the citizens; and in a very possible contingency, that of there being no tax upon land, would amount to an assumption by the government to pay the debts of certain individuals who have no peculiar claims for such a favor. We ought not to suppose such was the intent of the legislature, unless the language of the resolve be clear and definite to that effect.
But we do not think the resolve of 1787 requires such a construction, it being only, as we conceive, another attempt by the legislature, at the instance of the parties to the contract, to relieve them from the mode of carrying it into effect, established by the resolve of 1782, and which was found also to be inconvenient.
This resolve of 1787 only provides, that henceforwards the tenants of the lands shall be taxed in common with the inhabitants, in the same manner as though the lands were held by them in fee simple, and that the moneys arising therefrom be paid unto the treasurer of the Commonwealth, who is directed to pay the quitrents into the hands of the treasurer of said trustees on the 25th of March annually, &c. We see in this resolve only a new mode of executing the bargain sanctioned by the legislature in 1741. The word henceforward does not necessarily convey the idea of perpetuity ; it means no more than *134 hereafter, which may import a permanent or temporary arrangement, according to the general tenor of the instrument, and the nature of the subject matter about which it is used. The first provision in the resolve relates only to the mode of taxing the lands, and that is the same as was provided in the resolve of 1782, which was limited to seven years. No new advantage was obtained by the legislature. They merely consented to become the receivers in the first instance, of the rents, instead of being so only after the delinquen cy of the collectors. We cannot see from whence the opinion was deduced, that by virtue of this resolve, the legislature had, without regard to the amount of taxes, undertaken at all events to pay the quitrents The state of things at the time is to be considered; the taxes were then and were likely to continue an ample fund from which the rents might be paid; by the contract, the rents were to remain the same for nearly forty years to come. Neither party probably took into view the future increase of rents, or if they did, they probably did not anticipate a great diminution of taxes. The legislature ought not to be held, therefore, to so unequal a bargain, if this resolve can be construed into a bargain, unless the words of it are explicit and decisive, and we do not think they are of this character. Taking the whole proceedings from the beginning into view, and seeing in them no intimation that the public should pay the rents except out of the taxes, we cannot infer from that resolve, any obligation on the part of the government to pay the rents, when the taxes should cease to be a fund, from which they might be paid.
' That this was the sense of a subsequent legislature, to that which passed the resolve of 1787, appears from the resolve of 1796, which authorizes the governor to issue a warrant for the quitrents, until the further order of the legislature. We do not recur to this resolve as important in the construction of that of 1787, for that must stand by itself; but we think it may be resorted to as evidence of the opinion of enlightened men at that time, that there was nothing in the precedent resolve which created a legal obligation, beyond the pleasure of the legislature as to a time. We would by no means apply any rule of construction to a contract made by the government with individuals, which would not equally apply to a contract between individuals only; but we think it clear, that if similar proceedings could have taken place between two citizens, the judgment of any court called upon to give a construction, would be, that the stipulators had reference to the state of things existing at the time of making the contract, and not to a future important change in the condition of the parties, there being no consideration on one side for a. very great advantage on the other; and if a court of law could not arrive at such a conclusion, a court of equity would relieve the suffering party on the ground of mistake or misapprehension.
If, as seems to be supposed by the trustees and tenants, these lands were not liable to taxation, by virtue of the original tenure, or by the effect of the statute of 1741, there might be reason to suppose, that by the resolve of 1787, it was intended to purchase the right of taxation by paying the quitrents and then the bargain, though unequal in its operations, might with some -is *135 tice be claimed to be permanent. But we do not understand this to have been the case, or even the expectation of the parties at the time. The legislature had a perfect right to tax the lands to their full value before 1741, and it is by-implication only that they are deprived of their right by that statute. The utmost that can be claimed as a legal inference from that statute is, that in all future taxes, regard shall be had to the charge upon the land for rent; and perhaps under all circumstances the tenants may reasonably hope, that so far the legislature will feel itself bound in equity towards them; and considering that a more favorable inference has probably been drawn by the tenants, so that great inconvenience may result from the practical effect of the opinion now given by us, if adopted by the legislature, on the question of liability only, it is for the wisdom of the legislature to determine whether public expediency will not require or justify the same arrangement, as if a legal liability rested on them.
For the reasons above suggested, we are of opinion that there is no such legal obligation on the Commonwealth as is suggested in the order of the House requesting our opinion. As we had the written opinion of the attorney' and solicitor general before us, we thought it advisable to give opportunity for those interested adversely to the government to be heard ; and having given notice of this intention, the Hon. James Savage submitted an argument in favor of the legal obligation of the Commonwealth. We are aware of the imp 'rtance of this question to the trustees and the tenants of the land, and have w.th some reluctance submitted an opinion which may have an influence on the final determination of the legislature, since an opinion given in this form without the usual regular hearing, is liable to incorrectness. But it appearing to us to be a question on which, according to the constitution, either brancn of the legislature has a right to our opinion, we have performed our duty.
In our deliberations we were assisted by his excellency the governor, who was then associated with us, and he fully concurred with us in the result, which is now respectfully submitted.
30i/t May, 1825.